UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT WAYNE ANNABEL, II,

                Plaintiff,                      Case No. 1:16-cv-543

v.                                        Honorable Paul L. Maloney

MICHIGAN DEPARTMENT OF
CORRECTIONS et al.,

                Defendants.

_____/

## OPINION

       This is a civil rights action brought by a state prisoner against 28 defendants, pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, the Rehabilitation Act (RA), 29 U.S.C. § 794, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962 et seq. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed in part for failure to state a claim and in part for improper joinder.

**Discussion**

I.      Factual allegations

Plaintiff Robert Wayne Annabel, II presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF).  He sues the MDOC, its former Director Daniel Heyns, and its former food service provider Aramark Corporation, Inc. He also sues the following ICF officials:   Warden Willie Smith; Deputy Wardens Nannette Norwood, Erica Huss, and John Christiansen; Captain Kevin Woods, Lieutenants Christopher King, (unknown) Zwiker, and S. Rykse; Resident Unit Manager (RUM) E. Smith; Sergeant Dennis Grandy; Correctional Officers J. VanNortrick, (unknown) Scott, (unknown) Berrington, (unknown) Bennett, (unknown) Burns, (unknown) Eyer, D. Christiansen, and Joseph Novak; Social Workers James Apol and Robert Davis; Psychiatrist Dr. W. Yee; Nurse Practitioner (unknown) Sleight; Nurse Kronk; Food Service Manager J. Daugherty; and Chaplain C. Cheney.

In his 42-page complaint, Plaintiff lists the many hardships he allegedly has suffered while housed with the MDOC since 2008.  In his numerous prior lawsuits, Plaintiff has complained about being inadequately medicated for his bipolar disorder; being retaliated against for his many grievances and lawsuits; being defamed; being denied his Kosher diet; having his food poisoned; being subjected to the use of excessive force; having his property and mail stolen; being denied due process; and having prison officials interfere with his access to the courts.  He has alleged that all prior defendants have been engaged in a conspiracy to deny him his rights.  The first ten pages of the complaint describe incidents that occurred prior to the stated period of the complaint (March 24, 2014 through April 24, 2015) and recite the lawsuits previously filed by Plaintiff.  The remainder of the complaint consists of allegations about a litany of disparate events between March 24, 2014

- 2 -

and April 24, 2015, ostensibly linked by a conclusory claim that all events were part of a single, global conspiracy headed by Defendant Heyns, the then-Director of the MDOC:  claims involving retaliation against Plaintiff; denial of Plaintiff's access to the courts; interference with Plaintiff's mail; violations of Plaintiff's rights under the Eighth Amendment; violations of the Equal Protection Clause, the ADA and the RA; interference with Plaintiff's legal mail; violations of RICO; and deprivations of Plaintiff's property without due process.  A substantial number of Plaintiff's allegations and the Defendants he names overlap with allegations he previously raised in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.).  Many of those claims previously were dismissed with prejudice, though a few were subsequently dismissed without prejudice after Plaintiff failed to comply with the Court's orders.[1]

   The following is a summary of Plaintiff's allegations that fall within the time-frame Plaintiff purports to cover in his complaint.  On March 24, 2014, a magistrate judge from Eastern District of Michigan issued a report and recommendation (R&R) to grant one defendant's motion for summary judgment and to deny Plaintiff's motion for a temporary restraining order.  *See Annabel v. Heyns et al.*, No. 2:12-cv-13590 (E.D. Mich.) (R&R Mar. 24, 2014) (ECF No. 85).  Plaintiff alleged in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.), that interference

---

[1] In an opinion and order for partial dismissal and partial service issued on August 21, 2014, the Court dismissed numerous claims and defendants on the grounds that the allegations failed to state a claim:  the conspiracy claims; the claims related to the dismissal of the Warden's Forum representative; the claims against Heyns, Campbell, Nichols, and Zwiker for interfering with his mail on March 24, April 10, June 17, and July 2, 2014; Plaintiff's retaliation claims based on being placed on modified access, being kept in a stun cuff during transport, being denied hygiene supplies and bedding, being harassed by prisoner Halton, being transferred to ICF, and being subjected to Zwiker's verbal harassment; his free exercise claim against Zwiker; his Eighth Amendment claims against all defendants except Apol, Yee and Gerlach; his equal protection claims; and his claims under the ADA and the RA.  The Court therefore ordered dismissal of all Defendants in that action, except Defendants Apol, Yee and Gerlach.  In accordance with  Admin. Ord. 03-029, the Court ordered Plaintiff to provide three copies of the complaint for service of the complaint on the three remaining defendants.  Plaintiff neither complied with the order nor sought an extension of time in which to do so.  In an order and judgment issued on September 29, 2014, the Court dismissed the case for lack of prosecution, based on Plaintiff's failure to comply with the Court's order.

with his mail prevented him from receiving the R&R.  Also on that date, three other events allegedly occurred:  (1) MI-CURE sent Plaintiff a letter declining to investigate corruption in the grievance process; (2) two of Plaintiff's grievances were rejected; and (3) Plaintiff was placed on modified grievance access.  Plaintiff contends that all of these actions were retaliatory and designed to prevent him from making additional filings.

On April 30, 2014, three additional events occurred, which Plaintiff alleges were related to one another and to Plaintiff's allegations.  First, in the absence of objections from him, the district judge adopted the R&R in *Annabel v. Heyns et al.*, No. 2:12-cv-13590 (E.D. Mich. Apr. 20, 2014) (ECF No. 89).  Second, prisoner Abkedya Boyd apparently committed suicide at the Gus Harrison Correctional Facility (ARF).  Third, the defendants in *Annabel v. Frost et al.*, No. 2:14-v-10244 (E.D. Mich.) (none of whom are Defendants in this action) allegedly transferred the only prisoner representative in Unit 4 to Unit 5.  Plaintiff alleges that Prisoner Boyd was housed near Plaintiff and that Plaintiff had assisted prisoner Boyd to file a Step-II grievance and to prepare for litigation of an incident at Macomb Correctional Facility.  Plaintiff previously raised these allegations in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.), and the Court concluded the allegations failed to state a claim.  *Id.* (Op. & Ord. Aug. 21, 2014).

On May 1, 2014, Officer Pigg (who is not a defendant in this action) mocked Plaintiff for assisting other prisoners in preparing affidavits for a potential suit by Boyd's estate.  Plaintiff contends that Boyd's suicide was induced by staff harassment.  Plaintiff complains that the same pattern had occurred with another suicide in 2013, which involved another prisoner who was engaged in protected activity with Plaintiff.

On May 13, 2014, Plaintiff told his therapist, James Dickson (not a Defendant) that he wanted to be discharged from his mental health program at ARF, ostensibly to avoid further retaliation by ARF employees.  According to Plaintiff, in response to his request, "[D]efendants transferred him to the MDOC's most notoriously brutal Maximum Security, at Ionia Correctional Facility, where Plaintiff had previously suffered substantial staff abuse." (Compl., ECF No.1, PageID.13.)  Plaintiff alleges that, although he had been scored since 2008 as a Level-V security classification, he had spent nearly six consecutive years waived down to a Level-IV residential treatment program (RTP) or a Level-IV Outpatient Treatment Facility.  He suggests that he was transferred to Level V at ICF in retaliation for filing several lawsuits.  Plaintiff also alleges that the transfer to Level V reduced his parole likelihood from "average probability" to "low probability." (*Id.*, PageID.14.)  Again, Plaintiff raised these allegations in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.), and the Court dismissed the claim for failure to state a claim.  *Id.* (Op. & Ord. Aug. 21, 2014).

On May 16, 2014, shortly after Plaintiff arrived at ICF, Defendant Social Worker Apol interviewed Plaintiff.  Plaintiff complains that Apol was hostile, critical and aggressive in his demeanor.  Apol told Plaintiff, "Spell my name right when you sue me." (*Id.*, PageID.15.)  When Plaintiff expressed concerns about eating or taking medication at the facility because of his fear of staff tampering, Apol vowed to keep Plaintiff at ICF, on forced medication, if necessary.  Plaintiff told Apol to be sure to get a psychiatrist's signature on the forced-medication order, and Apol assured him that he understood his job.  Plaintiff raised these allegations in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.).  The issues were not fully litigated before the remainder of the complaint was dismissed for lack of prosecution.

- 5 -

Defendant Dr. Yee interviewed Plaintiff on May 19, 2014. Plaintiff explained his long history of bipolar disorder, but Yee allegedly disregarded the proven effectiveness of the psychotropic medications listed in Plaintiff's file. When Plaintiff explained his concerns about eating and taking medication, Yee told him that a hunger strike would not get him transferred. Plaintiff indicated that he would resume eating and taking his medications. Despite Plaintiff's subsequent compliance in taking the medication, Defendant Yee discontinued that medication on May 24, 2014. On May 27, Plaintiff was interviewed by Defendant Apol, an unknown female, and an older male social worker. Apol reviewed Plaintiff's kite complaining about Yee's discontinuation of his medication. Apol was dismissive and told him that his medications would not be resumed until Plaintiff seriously self-injured. An unknown male social worker told Plaintiff that he remembered Plaintiff from 2008 and that he saw that Plaintiff was significantly improved since 2008. The unknown social worker therefore recommended resuming Plaintiff's medication. Defendant Apol rejected the recommendation. These allegations were raised in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.), and the claims were ultimately dismissed without prejudice.

On July 14, 2014, Plaintiff sent three articles of expedited legal mail to Defendant D. Christiansen. Christiansen allegedly signed and pre-dated the receipts as of July 12, 2014, and then he destroyed the documents. On August 4, 2014, an individual mailed to Plaintiff a copy of the complaint in *Annabel v. MDOC et al.*, No. 1:14-cv-756 (W.D. Mich.), but Christiansen did not deliver the mail until October 20, 2014, after unspecified Defendants had read the complaint and after a first-shift sergeant had interrogated Plaintiff about the complaint.

- 6 -

Plaintiff complains that he has invested much time and money developing his paralegal skills, which he believes could provide a respectable income upon his release. He contends that he invested thousands of dollars in filing fees, legal texts, photocopies, postage, stationery and footlockers. Notwithstanding this property interest, in March or April 2015, unspecified Defendants ordered the segregation porter to destroy some of Plaintiff's legal property, including paperwork related to one of Plaintiff's prior lawsuits against ICF staff, *Annabel v. Caruso et al.*, 1:09-cv-176 (W.D. Mich.).[2] Plaintiff ultimately filed a claim seeking compensation for his property to the State Administrative Board. He subsequently sent a letter to the board explaining that the MDOC was not acknowledging or processing such claims. He claims that he also received no satisfaction through the grievance process. Plaintiff suggests that he therefore was without a post-deprivation remedy. This claim was raised in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.), and the claim was dismissed with prejudice.

Plaintiff sweepingly alleges that, between June 17, 2014 and April 24, 2015, "defendants often withheld or damaged Plaintiff's property." During that same time and with an allegedly retaliatory motive, Defendants Apol and Yee allegedly denied Plaintiff psychotropic medication, ostensibly in order to induce mental destabilization. Defendants Apol and Yee allegedly placed him on suicide restrictions, in order to prevent him from accessing his legal property. Plaintiff claims that being held in the stressful environment had caused him to be depressed, unable to have restful sleep, and to be unable to litigate and acquire career skills as effectively as he would like. He asserts that Defendants collectively continue to engage in unfair

---

[2]The Court notes that Defendants were granted summary judgment in the cited action on August 31, 2011. *See Annabel v. Caruso et al.*, No. 1:09-cv-176 (W.D. Mich. Aug. 31, 2011) (ECF Nos. 126-128).

litigation tactics, as did the defendants in *Annabel v. Armstrong et al.*, No. 1:14-cv-796 (W.D. Mich.), *Annabel v. Caruso et al.*, No. 1:09-cv-176 (W.D. Mich.), and *Annabel v. Heyns et al.*, No. 2:12-cv-13590 (E.D. Mich.).

Plaintiff complains that Defendants Yee and Apol also have demonstrated that their actions are retaliatory, because they have referenced his litigation efforts in his psychiatric medical file, stating on August 29, 2014:

> He is quite litigious, and seems to take pleasure in announcing various lawsuits that he files.  He seems to use these legal actions as a way to manipulate placement, with the reasoning that it would be 'unethical' for a provider to continue to provide services if he/she is named as a defendant in his legal action.  He has shown himself to be very calculating in this regard.

(Compl., ECF No. 1, PageID.19-20.)  On December 29, 2014, Dr. Yee wrote:

> Summary of Progress to Date:  Prisoner is resistant to treatment.  He remains highly litigious, and uses insults to try to evoke a response that he feels is grievable.

(*Id.*, PageID.20.)   Plaintiff contends that the placement of such references in his medical file violates prison policy, and he contends that officers are able misuse the MDOC database and communications system to view such statements.   He argues that this potential for abuse demonstrates that supervisory officials are well aware of his litigation.

Plaintiff next alleges that, on August 4, 2014, a woman named Zoe Keller mailed Plaintiff a copy of his complaint in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.).  Defendant D. Christiansen allegedly withheld the mail until October 20, 2014 and that, during the intervening period, many of the Defendants read the mail.  On August 8, 2014, a first-shift sergeant told Plaintiff that the inspector was investigating Plaintiff for using the mail to smuggle drugs.  On August 14, 2014, Plaintiff attempted to mail an expedited discovery request to

the attorney in *Annabel v. Heyns et al.*, No. 2:12-cv-13590 (E.D. Mich.), but it was discarded. Plaintiff sent the request again in November, at which time the attorney informed Plaintiff that he had not received the original August mailing.

Plaintiff alleges that, on October 20, 2014, unspecified Defendants destroyed without delivering an order denying leave to amend in *Annabel v. Frost et al.*, No. 2:14-cv-10244 (E.D. Mich.).  On February 17, 2015, unspecified Defendants allegedly destroyed without delivering a report and recommendation issued in the same case.  The case was dismissed on March 30, 2015, after Plaintiff failed to file objections to the report and recommendation.  Plaintiff asserts that the repeated interferences with his mail demonstrate that Defendants participated in a common plan organized by a central agent, such as Defendant Heyns.[3]

Plaintiff alleges that, between June 9, 2014 and June 17, 2014, Defendants W. Smith, Norwood and Huss employed prisoner Joseph Halton to harass and threaten Plaintiff by instructing their subordinates to give immunity to Halton for any harassment.  Plaintiff recites the following examples of the alleged scheme to allow harassment:  Halton screamed vulgarities at Plaintiff on Halton's first morning in the yard and threatened to attack Plaintiff, but staff did not issue a misconduct; Halton made attempts to incite gangs against Plaintiff; on June 17, 2014, Halton made more threats against Plaintiff as Halton left the unit that were condoned by an unnamed African-American officer, causing Plaintiff to "preemptively str[ike] Halton with a bare ink pen" (ECF No. 1, PageID.23).  Halton was moved to Segregation Unit 2 on August 4, 2014, where he continued

---

[3]The Court notes that, after Plaintiff demonstrated that he had not received the Report and Recommendation, the case was reopened and Plaintiff was granted an extension of time to file objections, .  *See Annabel v. Frost et al.*, No. 2:14-cv-10244 (E.D. Mich. June 23, 2015) (Ord, ECF No. 51).  After reviewing Plaintiff's objections, the Court again granted summary judgment to Defendants on January 22, 2016.  *See id.* (Ord. & J., ECF No. 59-60).

to harass Plaintiff with false statements and allegations.  On August 4, 2014, Halton returned from an interview with a sergeant, bragging that he had testified against Plaintiff.  Plaintiff contends that Defendants Smith, Norwood and Huss were the only officials who could authorize Halton's new cell assignment.  Plaintiff raised all but the last of these allegations about Halton in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.), and the Court dismissed the issue against these Defendants on the grounds that the allegations failed to state a claim.

Plaintiff alleges that he arrived in Segregation Unit 2 on the afternoon of June 17, 2014.  On June 18, 2014, at 9:30 p.m., Plaintiff damaged a sprinkler to protest staff's failure to provide him bedding and his legal material, well beyond the time authorized under MDOC policy. Plaintiff contends that Defendants denied his psychotropic medications to destabilize him and cause him harm and to cause him to be placed in segregation.  This issue was raised in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.), and the claim was dismissed for failure to state a claim.

Plaintiff next alleges that Defendants W. Smith, Norwood and Huss frequently acted in concert with Defendant Novak to deny Plaintiff's requests for law library materials and photocopies.  He alleges that the denial of photocopies resulted in the dismissal of his complaint in *Annabel v. Mich. Dep't of Corr.*, No. 1:14-cv-756 (W.D. Mich.).  Plaintiff contends that Defendants use prisoner law clerks to retaliate, having them provide only a few cases, marking those cases with "pitchfork gang signs," and marking most requests as "Out: Re-Order." (ECF No. 1, PageID.25.) Plaintiff alleges that, after he confronted unspecified Defendants and Defendant Christiansen in December 2014 and January 2015, the retaliation increased.  Defendant Norwood placed Plaintiff on a law book restriction, allegedly without adequate proof of the misuse of books.

Plaintiff also alleges that Defendants used prisoner-porter Jason to attempt to extort fees and sexual favors.  Plaintiff complained to Defendant Novak on February 10, 2015.  In April 2015, Plaintiff received a misconduct ticket for making false allegations that interfered with the administration of rules.  Plaintiff claims that unspecified Defendants frequently used prisoner Jason to enter cells in Segregation Unit 1, so that Jason could pack up or destroy other prisoners' property.

Plaintiff alleges that, on July 9, 2012, he engaged in discussions to settle a civil action, *Annabel v. Caruso et al.*, No. 1:09-cv-176 (W.D. Mich.).  Plaintiff signed the settlement agreement on July 18, 2012, in which he obtained a small cash amount and an agreement to provide him a Kosher diet.  Plaintiff alleges that Defendants have all acted to impede his rights under that settlement agreement.  Between June 17 and July 2, 2014, Plaintiff became afraid of food tampering and refused to accept all meals.  During that time, Defendant Kronk allegedly failed to ensure he received timely medical evaluations in compliance with prison policies, and Defendants Yee and Apol allegedly examined him for only a few minutes on a later date.  On June 18, Plaintiff was threatened with food loaf, followed by one week in which Defendant Zwiker brought him "special delivery duty" meals, consisting of unsealed Kosher meal trays.  (ECF No. 1, PageID.26.)  Zwiker allegedly denigrated Plaintiff's religion and mockingly described the delicious food.  Defendant Zwiker also allegedly withheld legal mail from Plaintiff on three occasions during this period. Plaintiff discovered a staple in his scalloped potatoes on July 7, 2014.  Plaintiff also complained about the uncovered food trays.  Defendant RUM E. Smith advised Plaintiff in a memorandum that the Kosher trays were never wrapped in cellophane, as it presented a security concern.  Plaintiff disputes the truth of that response.  On June 24, 2014, Defendants Yee and Apol began forcibly

- 11 -

medicating Plaintiff with Thorazine, allegedly in order to prevent Plaintiff from effectively litigating his claims.

On July 9, 2014, Plaintiff's hot tray was mockingly marked with the name "Adiline." Plaintiff demanded to speak with Sergeant Zwiker and took his food tray hostage. Defendant Vannortrick wrote a misconduct against Plaintiff, in which he allegedly defamed Plaintiff by saying that Plaintiff had stated that his "'hemorr[h]oids were inflamed and felt like they were about to set his cell on fire!!'" (ECF No. 1, PageID.27.) Plaintiff alleges that Vannortrick thereby intentionally revealed Plaintiff's embarassing health condition, which, Plaintiff alleges, implied that Plaintiff was a homosexual. Defendant Vannortrick read aloud the statement to an audience of nearly 40 prisoners. Defendant Rykse found Plaintiff guilty of the misconduct on July 21, 2014.

On July 10, 2014, Plaintiff's food tray was mockingly labeled "Alleshia."[4] (*Id.*, PageID.28.) On July 13, 2014, Plaintiff received ketchup packets with his breakfast, instead of jelly. On July 30, 2014 Plaintiff's breakfast tray was missing the powdered soy milk. Plaintiff complained to Defendants Scott and Norwood, neither of whom corrected the problems. On August 12, 2014, his dinner tray held only a peanut butter and jelly sandwich and a half-cup of potatoes.

Plaintiff told Defendant Apol on August 19, 2014 that he had filed a lawsuit against Apol. In response, Apol allegedly berated Plaintiff.

On August 27, 2014, after allegedly being denied photocopies and expedited legal mail by Defendants Grandy, Zwiker, and E. Smith, Plaintiff held his food slot hostage. He was sprayed with chemical agents, and he was hogtied. Defendants left a noose hanging inside his rear

---

[4]Plaintiff suggests that the unknown Defendants' use of the names "Adiline" and "Alleshia" on his food trays were motivated by Defendants' erroneous belief that the names were Jewish. Plaintiff cites no basis for his allegation, and the names on their face suggest that the individuals involved were mocking Plaintiff's name, "Annabel."

window, low enough for Plaintiff to put the noose around his neck.  Defendants Zwiker, Berrington, Bennett, and Scott all observed the noose around Plaintiff's neck for five hours, but they refused to release him, simply writing him false misconduct tickets for disobeying a direct order.  At about 10:15 p.m., Officer Braman called the third-shift lieutenant to remove both the noose and the chains.

The following day, Plaintiff again held his food slot hostage to protest alleged tampering with his breakfast tray and denial of legal access.  Defendants Grandy, Eyer, Burns, and Jensen hogtied Plaintiff again.  Later that day, Plaintiff asked King to loosen the belly chain, but King refused, hissing, "You're a piece of shit.  In three days I hope you die in those chains." (*Id.*, PageID. 32.)  Defendants Zwiker, Berrington, Bennett, and Kronk also denied pleas to loosen the chains and denied Plaintiff's requests for water.  Plaintiff alleges that he was hogtied in his cell for seven days, from August 28 to September 1, 2014, during which time Defendants Grandy, Eyer, Burns, Zwiker, Bennett, Scott, Berrington, and King all denied Plaintiff meals.  Grandy told Plaintiff that Defendant Willie Smith said that Plaintiff needed to stop filing grievances and lawsuits so that he would not have the problems.  When the chains were finally removed on September 4, 2014, Plaintiff dropped to the floor screaming, because the removal of the belly chain tore off skin and scabs.  Plaintiff also had sores on his ankles, wrists, and knees.  All requests for medical care were denied, and no Defendant documented Plaintiff's injuries.  Plaintiff eventually showed his scars to Defendants Sleight and Davis, but they refused to report that Plaintiff had been abused.

Plaintiff was placed on suicide observation status from August 28 through October 10, 2014, and most of the meals he received were non-Kosher finger food or foodloaf.  Plaintiff alleges that the deprivations violated his settlement agreement.  Plaintiff was told that Defendant

Cheney had removed him from the Kosher menu.  Cheney did not respond to Plaintiff's complaints. On September 25, 2014, Defendant Scott allegedly forced Plaintiff to accept a non-Kosher foodloaf, and Scott told Plaintiff that he did not care about the Jews.  Defendant Zwiker made derogatory remarks about Plaintiff being a child molester and denigrated Plaintiff's mother and his religion. On October 29, 2014, Plaintiff discovered a pea-size stone in his Kosher dinner, and the Islamic crescent moon was marked on his dinner tray.  Plaintiff complained to Daugherty, who found Plaintiff's grievances to be factually unsupported.

On November 6, 2014, Plaintiff concluded that Defendants would not be honest, so he sent Defendant Cheney "an accusing kite to end Kosher trays."  (*Id.*, PageID.31.)  On November 17, 2014, Defendant Daugherty "scorned" Plaintiff in a notice that Plaintiff was being removed from Kosher meals.  (*Id.*)

Plaintiff contends that Plaintiff's poor mental health treatment and the poor treatment of others, as evidenced by the four suicides, demonstrate that Defendant Heyns is deliberately indifferent to the quality of prisoner medical care, that Heyns wrongfully diverts funds from medical care to weapons, and that Heyns orchestrated the retaliatory punishment of mentally ill prisoners. Plaintiff also alleges that the long history of staff abuse is well known and condoned by Defendants Heyns, Willie Smith, Norwood and Huss.  In addition, he contends that Heyns, W. Smith, Norwood and Huss maintain their corrupt system by promoting the worst offenders:  Defendants Christiansen, Woods, King, Zwiker, Rykse and Grandy.

Further, Plaintiff alleges that all Defendants conspired to deny Plaintiff grievance forms and Step-II appeals, refused to deliver or process those grievances, or placed Plaintiff on modified grievance access.

Plaintiff contends that all Defendants have violated his rights under the First Amendment by denying him access to the courts, interfering with his mail, interfering with his religious exercise, and retaliating against him for filing grievances and lawsuits. In addition, Plaintiff contends that Defendants violated his rights under the Fourteenth Amendment (as well as the First Amendment) by repeatedly harassing him on the basis of his religion and coercing him to forfeit his religion and religious diet. He also contends that all Defendants have been deliberately indifferent to his serious medical and mental health needs and to his risks of harm from known staff and prisoner attacks. Further, he argues that the MDOC has denied him the benefits of mental health programs and legal research materials because of his mental illness, ostensibly in violation of the ADA , the RA, and the Fourteenth Amendment. Moreover, Plaintiff alleges that Defendants have violated RICO by their multiple illegal actions taken against Plaintiff. Finally, Plaintiff complains that Defendants have violated a variety of state laws.

Plaintiff seeks declaratory and injunctive relief and specific performance of his settlement agreement, together with compensatory and punitive damages.

II.    Sovereign Immunity

Plaintiff alleges that the MDOC violated his rights under the Equal Protection Clause by not providing for his mental health needs and by not allowing prisoners like himself, who remain in segregation for extended periods of time, the same access to computer-aided legal research services as other prisoners not housed in segregation. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,

98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826  (6th Cir. 1993).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment.  *See*, *e.g.*, *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000).  In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under § 1983 for money damages.  *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)).

Plaintiff alleges that the MDOC violated the ADA and the RA by not adequately treating his mental illness and by not allowing him access to computer-aided legal research, because his mental illness causes him to be frequently confined to segregation.  The Supreme Court has held that Title II of the ADA applies to state prisons and inmates.  *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs).  The proper defendant under a Title II claim is the public entity or an official acting in his official capacity.  *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002).  Plaintiff has named the MDOC as a Defendant and Defendants Heyns in his official capacity.

The State of Michigan (acting through the MDOC) is not necessarily immune from Plaintiff's claims under the ADA.  The ADA "validly abrogates state sovereign immunity" for "conduct that *actually* violates the Fourteenth Amendment[.]" *United States v. Georgia*, 546 U.S.

- 16 -

151, 159 (2006); *see also Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010).  If conduct violates the ADA but not the Fourteenth Amendment, then the Court must determine whether the ADA validly abrogates state sovereign immunity.  *Id.*  At this stage of the proceedings, the Court will presume that the ADA validly abrogates state sovereign immunity for Plaintiff's ADA claims. However, Title II of the ADA does not provide for suit against a public official acting in his or her individual capacity.  *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009).  Thus, Plaintiff properly brings his ADA claims against the MDOC and the remaining Defendants in their official capacities.

The requirements for stating a claim under the RA are substantially similar to those under the ADA, except that the RA specifically applies to programs or activities receiving federal financial assistance. By accepting these funds, states waive sovereign immunity from claims under the RA. *Nihiser v. Ohio EPA*, 269 F.3d 626, 628 (6th Cir. 2001).  For purposes of this opinion, the Court will assume that the MDOC receives federal assistance for the prison programs and activities at issue.  As a consequence, the MDOC and its agents acting in their official capacities are not immune from suit under the ADA and RA.

III.   Merits Review

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state

a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Moreover, a claim may be dismissed as frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Brown v. Bargery*, 207 F.3d 863, 866 (2000); *Lawler v. Marshall*, 898 F.2d 1196, 1198 (6th Cir. 1990).  Claims that lack an arguable or rational basis in law include claims for which the defendants are clearly entitled to immunity and

claims of infringement of a legal interest which clearly does not exist; claims that lack an arguable or rational basis in fact describe fantastic or delusional scenarios. *Neitzke*, 490 U.S. at 327-28; *Lawler*, 898 F.2d at 1199. The Court has the "unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Id.*, 490 U.S. at 327. "A finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 32 (1992). Examples of claims lacking rational facts include a prisoner's assertion that Robin Hood and his Merry Men deprived prisoners of their access to mail or that a genie granted a warden's wish to deny prisoners any access to legal texts. *See Neitzke*, 490 U.S. at 327-28; *Lawler*, 898 F.2d at 1198-99. An *in forma pauperis* complaint may not be dismissed, however, merely because the court believes that the plaintiff's allegations are unlikely. *Id.*

## A.      Overarching Conspiracy

Plaintiff's complaint involves numerous allegations against even more numerous Defendants, which occurred over a one-year period. In an attempt to join his otherwise unrelated claims in a single action, Plaintiff broadly alleges that all Defendants have engaged in an overarching conspiracy, led by Defendant Heyns, to subject him to retaliation, deny his religious rights, physically punish/torture him, deny his access to the courts, reject his mail, destroy his property, contaminate his food, deprive him of necessary medication, forcibly medicate him, harass him, defame him, and violate his settlement agreement.

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012)

(quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).  The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).  Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient.  *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegations of an overarching conspiracy are wholly conclusory, speculative, and baseless.  His allegations, even viewed in the light most favorable to Plaintiff, describe a number of discrete incidents that occurred over the course of a year, involving numerous individual officers and two different facilities.  Plaintiff suggests that, because so many incidents occurred, the then-Director of the MDOC, Defendant Heyns, must have orchestrated a global conspiracy to injure Plaintiff.  Plaintiff has provided no allegations establishing a link between Defendant Heyns and any other Defendant, and he has alleged facts suggesting that Defendant Heyns entered into any agreement with any other Defendant.  He relies entirely on an attenuated inference from the mere fact that each of the Defendants have taken one or more actions against him (e.g., retaliated against him for filing grievances and lawsuits; denied him adequate mental-health treatment; disciplined him; interfered with his mail; deprived him of his property; harassed him; etc.) to conclude that all Defendants must have been acting pursuant to a common scheme.  As the

- 20 -

Supreme Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680. Plaintiff therefore utterly fails to state a plausible claim of overarching conspiracy.

Moreover, considering Heyns' position, the number of individuals involved in incidents in at least two prisons, and the length of time during which the conspiracy allegedly existed (especially in light of Plaintiff's prefatory allegations beginning in 2009, which deems a "[b]ackground [n]arrative" to set the context for his overarching conspiracy (PageID.7)), such allegations are so unsupported as to be frivolous. Further, to the extent that Plaintiff alleges a conspiracy led by Heyns in relation to actions preceding July 2014, Plaintiff's claims were previously rejected in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich. Aug. 21, 2014) (No. 1:14-cv-756, PageID.170-171). As a result, Plaintiff's decision to raise the claim again in this action was wholly frivolous.

### B.      Previously Litigated Claims

In addition to his prior conclusory and frivolous claim of conspiracy, Plaintiff previously raised his claims about the actions leading up to his transfer to ICF on May 16, 2014, and those claims previously were decided against him. *See Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich. Aug. 21, 2014) (No. 1:14-cv-756, PageID.180-181). In addition, Plaintiff previously raised his claim that was being denied his ability to practice his "business" as

a prison paralegal, and that claim was adjudicated against him. (No. 1:14-cv-756, PageID.172-173.)
Further, Plaintiff earlier raised his claims that Defendant Heyns and two ARF officials interfered
with his legal mail between March 24, 2014 and April 10, 2014, and that Defendant Zwiker
interfered with delivery of his incoming mail between June 17 and July 2, 2014, denying him access
to the courts; both claims were adjudicated against him.  (No. 1:14-cv-756, PageID.174-176.)
Plaintiff also previously alleged that Defendant MDOC violated his rights under the ADA and the
RA by not adequately treating his mental illness and forcibly medicating him, and his claim was
dismissed for failure to state a claim.  (No. 1:14-cv-756, PageID.190-191)  Moreover, Plaintiff
previously alleged that Defendants' violations of his constitutional rights also amounted to
violations of RICO, a claim the court summarily dismissed.  (No. 1:14-cv-756, PageID.191-192.)
Further, Plaintiff previously alleged that Defendants Smith, Norwood, and Huss retaliated against
him for filing suit by having Prisoner Halton harass Plaintiff, and Plaintiff's claim was denied with
prejudice as conclusory. (No. 1:14-cv-756, PageID.179-180.)  Plaintiff also previously asserted and
the court previously rejected a claim that Defendant Zwiker had violated Plaintiff's First
Amendment religious rights by mocking his kosher diet and by regularly uncovering his food tray
and saying how delicious the food looked.  (No. 1:14-cv-756, PageID.183-184.)  In addition, the
court previously concluded that Plaintiff's had failed to state a claim against Defendant Heyns
arising from the alleged denial of medical care to Plaintiff by Defendants Apol and Yee.  (No. 1:14-
cv-756, PageID.185-186.)   Moreover, the court previously held that Plaintiff's claims that
Defendants denied him grievance forms and placed him on modified grievance access in retaliation
for his exercise of his First Amendment rights did not state a retaliation claim.  (No. 1:14-cv-756,
PageID.178.)

Upon review of the prior denials of the listed claims and a comparison of the allegations in the two complaints, the court concludes that Plaintiff is barred from relitigating these claims in this action by the doctrine of res judicata.

> Res judicata is often analyzed further to consist of two preclusion concepts: "issue preclusion" and "claim preclusion." Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. . . . This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar.

*Migra v. Warren City School District Board of Education,* 465 U.S. 75, 77 n. 1 (1984) (citation omitted). The doctrine of claim preclusion provides that, if an action results in a judgment on the merits, that judgment operates as an absolute bar to any subsequent action on the same cause between the same parties or their privies, with respect to every matter that was actually litigated in the first case, as well as every ground of recovery that might have been presented. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 582 (6th Cir. 1994); *see Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 467 n.6 (1982); *see also Bowen v. Gundy*, No. 96-2327, 1997 WL 778505, at * 1 (6th Cir. Dec. 8, 1997). Claim preclusion operates to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudication. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). In order to apply the doctrine of claim preclusion, the court must find that (1) the previous lawsuit ended in a final judgment on the merits; (2) the previous lawsuit was between the same parties or their privies; and (3) the previous lawsuit involved the same claim or cause of action as the present case. *Allen*, 449 U.S. at 94; *accord Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).

Both issue and claim preclusion are applicable here. In most cases, the Defendants named in this action were named in the earlier action, in relation to the claims discussed. The issues were actually litigated and decided against Plaintiff in the earlier action in relation to those Defendants. Issue preclusion therefore bars relitigation of the claims here. Moreover, to the extent that Plaintiff now names additional possible Defendants on some of the issues raised and denied in the earlier action, his claims should have been advanced in that case and so are barred by the doctrine of claim preclusion.

As a consequence, the following issues were frivolously brought in this action, because they are barred by res judicata: Plaintiff's conspiracy claim preceding July 2014, Plaintiff's claims involving his transfer to ICF on May 16, 2014; the claims involving Plaintiff's inability to practice his "business" as a prison paralegal; Plaintiff's claims that Defendant Heyns and two ARF officials interfered with his legal mail between March 24, 2014 and April 10, 2014, and that Defendant Zwiker interfered with delivery of his incoming mail between June 17 and July 2, 2014; Plaintiff's claim that Defendant MDOC violated his rights under the ADA and the RA by not adequately treating his mental illness and forcibly medicating him; Plaintiff's RICO claims; Plaintiff's allegations that Defendants Smith, Norwood, and Huss retaliated against him for filing suit by having Prisoner Halton harass Plaintiff; Plaintiff's claim that Defendant Zwiker violated Plaintiff's First Amendment religious rights by mocking his kosher diet by regularly uncovering his food tray and saying how delicious the food looked; Plaintiff's claim against Defendant Heyns participated in the denial of medical care to Plaintiff by Defendants Apol and Yee; and Plaintiff's claims that Defendants denied him grievance forms and placed him on modified grievance access in retaliation for his exercise of his First Amendment rights.

- 24 -

### C.     Misjoinder

As discussed, Plaintiff's complaint sweepingly collects all of his complaints related to his confinement over the period of one year.  The only thing linking those claims was his wholly insufficient claim of a universal conspiracy, which was both previously litigated in this Court and frivolous.  Absent such an overarching claim linking Plaintiff's other claims, the Court must consider which of Plaintiff's many claims are properly joined in this action.  The Court concludes that a frivolous claim of conspiracy is insufficient to create a basis for joining the remaining claims. *See Grooms v. Tencza*, 2010 WL 1489983, at *3 (N.D.Ill. Apr.13, 2010) (finding conclusory conspiracy allegation insufficient to join multiple unrelated defendants in single suit); *see also Srivastava v. Daniels*, No. , 2010 WL 2539451, at * 5 (N.D. Ind. June 14, 2010) (finding that frivolous RICO claim could not authorize joinder of otherwise "buckshot" complaint of unrelated claims).

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims.  Rule 20(a)(2) governs when multiple defendants may be joined in one action:  "[p]ersons . . . may be joined in one action as defendants if:  (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Rule 18(a) states:  "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."

Courts have recognized that, where multiple parties are named, as in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action.  It is not concerned with joinder of claims, which is governed by Rule 18.  Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . .
>
> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

7 CHARLES ALLEN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE CIVIL § 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), and *Garcia v. Munoz*, No. 08-1648, 2007 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also Neitzke v. Williams*, 490 U.S. 319, 328 (1989) (joinder of defendants is not permitted by Rule 20 unless both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact." *Proctor*, 661 F. Supp. 2d at 778.  When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations." *Id.* (quoting *Nali v. Michigan Dep't of Corrections*, 2007 WL 4465247, *3 (E.D. Mich. December 18, 2007)).

Permitting the improper joinder in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See Riley v. Kurtz*, 361 F. 3d 906, 917 (6th Cir. 2004).  Under the

PLRA, a prisoner may not commence an action without prepayment of the filing fee in some form. *See* 28 U.S.C. § 1915(b)(1). These "new fee provisions of the PLRA were designed to deter frivolous prisoner litigation by making all prisoner litigants feel the deterrent effect created by liability for filing fees." *Williams v. Roberts*, 116 F. 3d 1126, 1127-28 (5th Cir. 1997). The PLRA also contains a "three-strikes" provision requiring the collection of the entire filing fee after the dismissal for frivolousness, etc., of three actions or appeals brought by a prisoner proceeding in forma pauperis, unless the statutory exception is satisfied. 28 U.S.C. § 1915(g). The "three strikes" provision was also an attempt by Congress to curb frivolous prisoner litigation. *See Wilson v. Yaklich*, 148 F. 3d 596, 603 (6th Cir. 1998).

The Seventh Circuit has explained that a prisoner like Plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produced but also to ensure that prisoners pay the required filing fees-for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .
>
> A buckshot complaint that would be rejected if filed by a free person -- say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions -- should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012) ("A litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot."); *Brown v. Blaine*, 185 F. App'x 166, 168-69 (3rd

Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three strikes provision of PLRA); *Patton v. Jefferson Correctional Center*, 136 F.3d 458, 464 (5th Cir. 1998); *Shephard v. Edwards*, 2001 WL 1681145, * 1 (S.D. Ohio Aug[.] 30, 2001) (declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing fee, because it "would improperly circumvent the express language and clear intent of the 'three strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of obtaining a "strike" under the "three strikes" rule).   To allow Plaintiff to proceed with these improperly joined claims and defendants in a single action would permit him to circumvent the PLRA's filing fee provisions and allow him to avoid having to incur a "strike[,"] for purposes of § 1915(g), should any of his claims turn out to be frivolous.

Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action."   Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately.  *See DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 07-cv-83, 2008 WL 485204, at *2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("Parties may be dropped . . . by order of the court . . . of its own initiative at any stage of the action and on such terms as are just.").   "Because a district court's decision to remedy misjoinder

- 28 -

by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'"  *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV, Inc.*, 467 F.3d at 845.  Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice.  *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846-47; *Michaels Building Co.*, 848 F.2d at 682.

In this case, Plaintiff brings his claims largely under 42 U .S.C. § 1983.  For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See  Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985) (holding that, because no statute of limitations is expressly provided, state statutes of limitations and tolling principles for related types of cases are borrowed to determine the timeliness of claims asserted under 42 U.S.C. § 1983);  Mich. Comp. Laws § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999).  Furthermore, "Michigan law provides for tolling of the limitations period while an earlier action was pending which was later dismissed without prejudice." *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir. 2003).

Plaintiff also raises claims under the ADA and the RA, as well as under RICO.  The statute of limitations under Title II of the ADA also is governed by the borrowing principle of *Wilson*, 471 U.S. at 268-69.  *See McCormick v. Miami University*, 693 F.3d 654, 663-64 (6th Cir.

2012).  As a result, in Michigan, the statute of limitations for such claims is three years.  For RICO

claims, the statute of limitations is longer:  four years.  *See Agency Holding Corp. v. Malley-Duff*

*& Assoc., Inc.*, 483 U.S. 143, 156 (1987).

        The actions about which Plaintiff complains occurred in 2014 and 2015, well within

the three-year or four-year period of limitations.  As a result, no claim raised in the complaint is at

risk of being time-barred.  As a result, dismissal of any improperly joined claims would not be

unjust.

        Because Plaintiff's complaint contains no central claim, the Court must look to

Plaintiff's first named Defendant and first set of factual allegations in determining which portion

of the action should be considered related.  Defendant MDOC is the first Defendant named in the

action.  Plaintiff alleges that the MDOC and the MDOC alone violated his rights under the Equal

Protection Clause, the ADA, and the RA.

        As earlier discussed in this opinion, the MDOC is immune from suit for Plaintiff's

equal protection claim under § 1983.  In addition, as also discussed, Plaintiff's principal ADA and

RA claim against the MDOC – that the MDOC violated his rights under the ADA and RA when

it denied adequate medical care – was previously decided against Plaintiff and therefore is barred

by res judicata.

        Title II of the ADA provides, in pertinent part, that no qualified individual with a

disability shall, because of that disability, "be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity."  *Mingus v. Butler*,

591 F.3d 474, 481-82 (6th Cir. 2010) (citing 42 U.S.C. § 12132).  In order to state a claim under

Title II of the ADA, Plaintiff must show:  (1) that he is a qualified individual with a disability;

(2) that defendants are subject to the ADA; and (3) that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his disability.  *See Tucker v. Tennessee*, 539 F. 3d 526, 532-33 (6th Cir. 2008); *see also Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003).  The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).  *See Tucker v. Tennessee*, 539 F.3d 526, 532-33 (6th Cir. 2008).  The ADA defines the term "disability" as follows:  "[1] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." 42 U.S.C. § 12102(2).  Similarly, Section 504 of the Rehabilitation Act protects any "otherwise qualified individual" from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" under specified programs "solely by reason of her or his disability."  29 U.S.C. § 794(a).

Assuming that Plaintiff's mental illness constitutes a disability under the ADA and RA, Plaintiff does not allege that he has been discriminated against, or that he has been unable to participate in or receive the benefit of a service, program, or activity available to other inmates by reason of that disability.  Instead, Plaintiff alleges that he has not received library access akin to prisoners in the general population because he has been in segregation.  And, he contends, his mental illness makes it more likely that he will be placed in segregation because of his conduct.

Plaintiff's own allegations fail to support a conclusion that his periodic denials of access to electronic legal research were due to his disability, as is necessary to state a claim under

- 31 -

the ADA and the RA.  Instead, according to his own allegations, he was placed in segregation as a result of his repeated misconduct tickets.  As a result, his ADA and RA claims are both wholly conclusory, *see Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555, and belied by his own factual allegations. He therefore fails to state an ADA or RA claim against the MDOC.

Because the MDOC is immune from Plaintiff's § 1983 claims and because Plaintiff fails to state an ADA or RA claim against the MDOC, the MDOC will be dismissed as a Defendant in this action.  Plaintiff makes no allegations against any other Defendant that are related to his claims against the MDOC.  As a result, no claim against any of the other Defendants is properly joined under FED. R. CIV. P. 20(a).

In determining relatedness, the Court also will look at Plaintiff's first set of allegations.  Plaintiff expressly alleges that he intends to raise all of the claims that occurred between March 2, 2014 and April 24, 2015.  (ECF No. 1, PageID.7.)  However, because of the litany of claims recited in the complaint that precede those dates, the first claims actually alleged in the complaint appear to be set forth on page eleven of the complaint, shortly after Plaintiff begins the section entitled, "Principle Facts Supporting Claims." (*Id.*, PageID.10.)  On page eleven, Plaintiff makes allegations about harassing actions, including the decision to transfer Plaintiff to ICF, that were taken by certain ARF officials.  As previously discussed, these first claims were resolved against Plaintiff in *Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich. Aug. 21, 2014).  They therefore are barred by res judicata.  Moreover, according to Plaintiff's own complaint, those claims involved ARF Defendants, none of whom is a Defendant in this action. They therefore fail to state a claim against any Defendant.  As a result, none of the claims against

the Defendants actually sued in this action are transactionally related to the first claims in his complaint.

In sum, because no claims were made against Defendant MDOC acting in conjunction with another official, and because Plaintiff's remaining claims are not transactionally related to his first claim, Plaintiff's remaining claims against the other Defendants are improperly joined under Rules 18 and 20 of the Federal Rules of Civil Procedure. *See Proctor*, 661 F. Supp. 2d at 778; *Garcia*, 2007 WL 2064476, at *3; *see also Neitzke v. Williams*, 490 U.S. 319, 328 (1989); *George*, 507 F.3d at 607. As a consequence, all of Plaintiff's claims, other than those against the MDOC and those that were previously decided against Plaintiff in an earlier action, will be dismissed without prejudice because they were improperly joined in his complaint.

### D.     Future Filings

Plaintiff is a frequent litigator in this Court and in the Eastern District of Michigan. In several of Plaintiff's actions, Plaintiff has operated much as he has in this action – by filing a complaint naming numerous Defendants, most of whom were unrelated and including Defendant Heyns or his predecessor, Patricia Caruso, as responsible parties for the conduct of other individuals. *See, e.g., Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich.); *Annabel v. Heyns et al.*, No. 2:14-cv-11337 (E.D. Mich.); *Annabel v. Heyns et al.*, No. 2:12-cv-13590 (E.D. Mich. Aug. 7, 2013) (Rep. & Recommendation (R&R), Doc #34, PageID.586); *Annabel v. Caruso et al.*, No. 1:09-cv-176 (W.D. Mich.). After having a complaint against Defendant Heyns first dismissed because his allegations were based on supervisory liability, *see Annabel v. Heyns et al.*, No. 14-11337 (E.D. Mich. July 31, 2015) (R&R adopted on September 21, 2015), Plaintiff began to add allegations, as he did in this case,  that all Defendants are linked by

a conspiracy "orchestrated by Defendant Heyns, to deprive petitioner of his constitutional rights in retaliation for a prior lawsuit filed against Heyns and other prison officials and in retaliation for various grievances." *Annabel v. Heyns et al.*, No. 2:12-cv-13590 (E.D. Mich. Aug. 7, 2013) (Rep. & Rec., Doc #34, PageID.586); *see also Annabel v. Mich. Dep't of Corr. et al.*, No. 1:14-cv-756 (W.D. Mich. Aug. 21, 2014) (No. 1:14-cv-756, PageID.170-171). Those allegations have routinely been held not to state a claim. *Id.*

The instant 40-page complaint constitutes an abusive amalgam of improperly joined claims in a single action, including claims that had been raised and rejected in earlier complaints. When viewed against Plaintiff's litigation history, the filing of the instant misjoined complaint borders on conduct that would warrant the imposition of restrictions on future filings. *See Shepard v. Marbley*, 23 F. App'x 491, 493 (6th Cir. 2001) (discussing the court's inherent authority "to impose pre-filing restrictions on an individual with a history of repetitive or vexatious litigation") (citing *Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 269 (6th Cir. 1998), and *Ortman v. Thomas*, 99 F.3d 807, 811 (6th Cir. 1996)). That said, the Court will not impose such restrictions at this time. Plaintiff is hereby notified, however, that any future attempt to file a blunderbuss complaint like the one filed in this case will be met with an order restricting Plaintiff from filing any complaint longer than ten pages or any complaint arising out of more than one transaction or occurrence.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendant MDOC will be dismissed with prejudice on grounds of immunity and failure to state a claim, pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's claim of conspiracy is dismissed on the grounds that it is both frivolous and

fails to state a claim.  Further, Plaintiff's claims that were previously adjudicated against him (regarding his transfer to ICF on May 16, 2014; his inability to practice his "business" as a prison paralegal; interference with his legal mail between March 24, 2014 and April 10, 2014, and with delivery of his incoming mail between June 17 and July 2, 2014; his RICO claims; his claim against Defendants Smith, Norwood, and Huss for encouraging Prisoner Halton harass Plaintiff; his claim that Defendant Zwiker mocked his kosher diet; his supervisory liability claim against Defendant Heyns for denying him medical care; and his due process and retaliation claims about being denied grievance forms and being placed on modified grievance) will be dismissed with prejudice as frivolous.  His remaining claims will be dismissed without prejudice for improper joinder.[5]

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

A Judgment consistent with this Opinion will be entered.

Dated: <u>October 14, 2016</u>            <u>/s/ Paul L. Maloney</u>
                                        Paul L. Maloney
                                        United States District Judge

---

[5] In light of the Court's disposition, Plaintiff's motion seeking preliminary injunctive relief (ECF No. 6) will be denied as moot.